UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

IN RE:

FREDERICK KEITEL,                                   CASE NO. 15-21654
                                                    CHAPTER 11

                    Debtor.
_____/

## FOURTH AMENDED DISCLOSURE STATEMENT

The Debtor, FREDERICK KEITEL, submits this Disclosure Statement to its creditors and other parties in interest.  The approval of the Disclosure Statement is not tantamount to a decision by the Court on the merits of the Plan.

## I. INTRODUCTION

A.  Purpose of this Document.

This Disclosure Statement is submitted pursuant to the requirement imposed on the proponent of a Plan of Reorganization by 11 U.S.C. § 1125.  The purpose is to disclose information deemed to be material, important, and necessary for the creditors to arrive at a reasonably informed decision in exercising their right, or to vote for acceptance or rejection of the Plan of Reorganization.  This Disclosure Statement should be read in conjunction with the accompanying Plan of Reorganization. The Plan is a legally binding document once it is approved by the Court, and should be read in its entirety.  Accordingly, creditors may wish to consult with their own attorney to more fully understand the Plan.

No representations concerning the Debtor, its future business operations, the value of its property or the value of any benefits offered to holders of claims or interests in connection with the Plan are authorized other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure acceptance of the Plan other than those contained in this Disclosure Statement should not be relied upon by a creditor or interest holder.  Any such additional

1

representations and inducements should be reported to counsel for the Debtor at the address below and to the United States Trustee.

The information contained in this Disclosure Statement has not been subject to certified audit and is based in large extent on information maintained and collected by the Debtor. While every effort has been made to provide the most accurate information available, the books and records of the Debtor are not warranted or represented to be completely and historically accurate. Further, much of the information contained herein consists of projections of future performance. While every effort has been made to insure that the assumptions are valid and that the projections are as accurate as can be made under the circumstances, neither the Debtor nor its accountant undertakes to certify or warrant the absolute accuracy of the projections.

B.  Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1.     Time and Place of the Hearing to Confirm the Plan

The hearing at which the Court will determine whether to confirm the Plan will take place on _____, in Courtroom B, Room 801, at 1515 North Flagler Drive, West Palm Beach, FL 33401.

2.     Deadline for Voting to Accept or Reject the Plan

If you are entitled to accept or reject the plan, vote on the enclosed ballot and return the ballot to the United States Bankruptcy Court, 1515 N. Flagler Drive, Room 801, West Palm Beach, FL 33401. See section VIII for a discussion of voting eligibility requirements.

The ballot must be received by _____ or it will not be counted.

3.     Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court and served upon the

Debtor, Frederick J. Keitel, III, P.O. Box 3243, Palm Beach, FL 33480; Arial Rodriguez, Office of the U.S. Trustee, 51 S.W. First Ave, Suite 1204, Miami, FL 33130; and all interested parties by _____.

4.      Identity of Person to Contact for More Information

If you want additional information about the Plan, you should contact Frederick J. Keitel, III, Palm Beach, FL 33480.

5.      Effective Date.  As the term is used in this disclosure statement and the plan of reorganization, the effect date shall be 10 days after the date the Order of Confirmation becomes final.

## II.  BACKGROUND

On July 13, 2016, during a hearing before Chief Judge Paul Hyman, Jr., Judge Hyman recused himself and ordered certain investigations to take place as a result of allegations brought to his attention by D'Agostino attorney, Larry Glick:

**THE COURT: …I'm going to end the hearing now.  There's been allegations that I, personally, am case fixing.**

**Mr. Turner, I hereby instruct you to investigate Mr. Furr, Ms. Feinman, and to the extent you need to investigate me, to do so, in order to ascertain whether there are grounds to refer this matter to the U.S. Attorney's Office.  Do not hesitate to come, have whomever interview me.**

**But based on these allegations, I hereby recuse myself and transfer the case -- the case will be transferred to Judge Kimball.**

**And Mr. Turner, you started to say something?**

**MR. TURNER:  Judge, I'm going to have to -- obviously, I understand.  I'm writing it down about the investigation.  If it involves one of the attorneys in our own office, it may be somethings that's outside of the local offices.**

3

**THE COURT:  Good point.  The same reason I'm recusing myself.**

**MR. TURNER:  I understand, Your Honor.**

**THE COURT:  I forgot that.  So do whatever -- I guess what I'm really instructing you, to do whatever is appropriate in order to investigate the matter.**

(P. 54, L. 16-25; P. 55, L. 1-15, Excerpt of Hearing – July 13, 2016, at 9:30 a.m., ECF #208, 209, 194, 235, attached hereto as Exhibit "A").

During the Debtor's legally recorded conversation with Robert Furr, Mr. Furr reiterated threats previously made during their earlier conversation on January 13, 2016, when the Debtor fired him verbally and in writing, and wielded additional threats in response to the Debtor's announced intention to hire new counsel.  Mr. Furr's threats included, but were not limited to:

a)  Having the U.S. Trustee's Office remove control from the Debtor: "There will be a fucking trustee in there tomorrow and you'll lose control!  You let me handle it the way I want or fuck you!"

b)  Preventing the Debtor from reorganizing or selling any property: "You won't get any property sold!"  "You want to lose the entire deal?"  "If you don't have us, you're dead!  You want to be dead… go die… go kill yourself!  You might as well get a gun, put it to your head and pull the trigger!"

c)  Claims of influence over U.S. Trustee, Heidi Feinman, and through her, Judge Hyman: "I can get Feinman to do whatever I want, and Hyman will approve it!"

Yet, despite Judge Hyman's direct order on July 13, 2016 (nearly four months ago), neither Assistant U.S. Attorney Steven Turner nor DOJ Trial Attorney Ariel Rodriguez have contacted the Debtor.  The Debtor believes that this lack of action constitutes a willful obstruction of justice.

Upon being assigned to this case, Rodgriguez, a friend and co-worker of both Feinman and Turner, immediately moved for a Motion to Convert and Appoint a Trustee, effectively stripping Debtor of his rights, including but not limited to the right to prosecute his complaints against Feinman

and Furr.

It is clear that both Turner and Rodriguez should have been disqualified due to their conflict of interest (see Judge Hyman's comments about referral to an outside office). Instead, they are permitted to remain and file a potentially devastating Motion to Convert in an effort to destroy and discredit the Debtor.

The Debtor feels strongly that these DOJ attorneys are intent on controlling the outcome of this case, much the same way they did in the WMK matter, when Furr refused to provide representation on the day of an important hearing because Feinman wanted the Debtor to drop his complaint against Judge Sasser. When the Debtor refused, Furr again threatened not to appear in court. As a result, Judge Hyman, pursuant to the recommendation of the U.S. DOJ Attorney and U.S. Trustee Heidi Feinman, dismissed Debtor's case, costing the Debtor over $1.6 million and depriving WMK's creditors of any compensation.

The Debtor feels that Assistant U.S. Trustee Rodriguez is acting unprofessionally, should have recused himself per Judge Hyman's suggestion, and that his current Motion to Convert is not in the best interests of the creditors, but a rather transparent attempt to retaliate against the Debtor for bringing his whistleblower allegations of corruption against his colleagues.

The Debtor, Frederick Keitel, is an individual that, at the time of the filing, owned various interests in companies that own valuable commercial real estate.   At the time of the filing of his case, the Debtor's companies and their assets were valued at over $30,000,000.00.

| Company | % ownership | Assets owned | Value of assets |
|---|---|---|---|
| FJK Properties | 100% | 230 Royal Palm Way | $ 5,733,333.00 (net value) |
| FJK III Properties | 100% | 240 Royal Palm Way | $ 1,566,666.00 (net value) |
| FJK IV Properties | 100% | 50 % interest in FJK-Tee Jay 241 Royal Palm Way | $ 6,750,000.00 |

| | | |
|---|---|---|
| KMS Restaurant Corp 100% | malpractice claim (claim against Cohen, Norris et al And Katzman Wasserman et al) | $ 4,000,000.00 |
| Frederick J. Keitel, III, P.A. 100% | none | $ 0,00 |
| WMK Properties          100% | 5829 Corporate Way | $ 334,203.00 (net value) |
| FJK Management, LLC 100% | none | $ 0.00 |
| Florida Capital Management 100% | 237 Brazilian Ave. | $ 5,500,000.00 |
| Palm Beach Executive Suites 100% | none | $ 0.00 |
| 812 Investors          100% | none | $ 0.00 |

412 Brazilian Ave.

At the time of the filing, the Debtor individually owned property located at 412 Brazilian Ave, Palm Beach, FL. The Court approved the sale of the property [ECF #83] on January 13, 2016. The Debtor netted approximately $1,400,000.00, which was placed in the trust account of Furr and Cohen pending further resolution of claims. On September 2, 2016, the Court approved a settlement with PNC allowing PNC to be paid $1,175,000.00. There remains the amount $305,958.81 in the trust account of Furr and Cohen.

At the time of the filing of the case, there were three other encumbrances on the property. Thomas B. D'Agostino, Sr. held two judgments that were secured by the property. Tasha Enterprises extended a loan to the Debtor and was granted a security interest on the property. The Debtor contends that the judgments held by Thomas B. D'Agostino have been satisfied. D'Agostino disputes this assertion and claims the money paid was either applied to other debts or was insufficient to satisfy the claim. However, there is sufficient money in Trust to satisfy the claim. Tasha Enterprises is an entity controlled by the Debtor's mother in law. There is an unresolved issue as to whether Tasha Enterprises is an insider as defined by 11 U.S.C. § 101(31). If Tasha Enterprises is an insider, part of the debt

6

would be unsecured.

The Debtor filed an adversary complaint to determine the validity, priority and extent of the liens on the property, Adv. Case No. 16-01042. The complaint was recently dismissed for failure to prosecute. However, the Debtor has filed a Motion to Vacate the judgement (Exhibit "C-1").

The Debtor believes an objection to the claims of D'Agostino and Tasha may help to resolve the issue as to who has the rights to the $305,958.81 being held in trust.

FJK IV Properties – 241 Royal Palm

The Debtor is the 100% shareholder of FJK IV Properties. FJK IV Properties owns 50% of FJK-Tee Jay that owns the property located at 241 Royal Palm Blvd. The Debtor's shares in FJK IV Properties has been pledged as collateral to a debt owed to Thomas D'Agostino, Sr.[1] The shares have a value of approximately $6,750,000.00.

At the time of the filing of the case, the Debtor was involved in litigation with his corporate partners relating to FJK IV Properties' interest in FJK-Tee Jay. The lawsuit is pending in the 15th Judicial Circuit, in and for Palm Beach County, FL Case No. 502012CA023240. In the lawsuit, the Debtor has claimed that the partners failed to maximize the value of the property to his detriment. The partners have filed a counter-claim alleging that the Debtor improperly used partnership funds for his own benefit and took other action leading to damages to the partners.

The estimated value of this property is greater than $12,200,000.00. It is subject to a disputed lien held by Thomas D'Agostino, Sr. in the approximate amount of $4,734,000.00.[2] Debtor received numerous letters of intent to purchase and contracts to purchase the property owned by FJK-Tee Jay. One offer was for $12,200,000.00 with substantial earnest money deposits and a quick cash closing.

---

[1] The Debtor asserts that the amount owed to Thomas D'Agostino, Sr. has been satisfied and that the shares are no longer encumbered. Despite demands, D'Agostino has refused to return the stock.

[2] The placement of the lien on the property was a result of D'Agostino and Tee-Jay of Florida, RLLP illegally redeeming the Final Judgment of foreclosure when they were not a party to the foreclosure action and had no standing.

The D'Agostinos refused to consider or negotiate with any buyers, creating further disruption to the Debtor's ability to reorganize (see attached composite Exhibit "B").

<u>Florida Capital Management – 237 Brazilian</u>

The Debtor also is involved in litigation relating to his company, Florida Capital Management ("FCM"). FCM filed bankruptcy, but the bankruptcy was voluntarily dismissed on May 24, 2016. FCM owns a piece of property worth approximately $5,500,000.00. Thomas D'Agostino has asserted a claim in this case in the amount of $4,548,706.09 for unpaid loans. D'Agostino is seeking to foreclose on the property. In defense, the Debtor has asserted that the loan has been overpaid and that D'Agostino owed the Debtor over $800,000.00. Even if the Debtor were to lose the case, but get credit for a payment of $1,230,000 made to D'Agostino, the Debtor has calculated that he would owe no more than $800,000 to D'Agostino.[3]

Despite the litigation, FCM is redeveloping that property and has spent over $400,000.00 toward the redevelopment. To date, the Debtor and FCM has obtained Architectural Commission ("Arcom") approval from the Town of Palm Beach, furnished all drawings for the property, hired a contractor and architect, and secured $5,200,000.00 financing for the project (Exhibit "C"), which will dramatically increase the value of the property. The $5,200,000.00 is in the Trust Account of Haile, Shaw & Pfaffenberger, P.A. on behalf of an entity owned by the Debtor's father in law, Peter Callahan. The entity is 237 Brazilian, LLC. 237 Brazilian is committing $100,000.00 to the demolition of the existing buildings on the property and for permitting for new construction. The remaining funds will be used for construction of the townhomes on the property. After the development is finished, it is expected that the two townhomes will have a value of $7,500,000.00 to $8,000,000.00 each. In addition, the Debtor will receive a development fee of at least $15,000.00 per month. A copy of the

---

[3] In a six hour evidentiary hearing held in April, 2015, Judge Hyman opined that he did not believe D'Agostino's testimony was a gift, and that the testimony flies in the face of credibility. Attached are copies of the wire transfer, Mortgage Note, and Warranty Deed, all containing FCM's client file number (Exhibit  ). Judge Hyman made it clear that according to 11th Cir case law and equity, that if Keitel didn't get credit for the $1,230,000 payment in the FCM case, that he would receive credit in the bankruptcy case.

commitment letter is attached as Exhibit "D-1".

FJK Properties (230 Royal Palm Way) and FJK III Properties (240 Royal Palm Way)

Since the filing of the case the properties owned by FJK Properties (230 Royal Palm Way) and FJK III Properties (240 Royal Palm Way) have been sold.  The Debtor did not receive any proceeds.  However, one of the creditors in this case, Thomas D'Agostino, Sr., was paid $4,431,615.55, satisfying his claim in this case.  D'Agostino recently amended his claim and asserts that $337,659.41 is owed for attorney's fees, however, the Debtor has attached emails from D'Agostino attorney Larry Glick, as well as various motions, which dispute that claim.  If this is a valid claim, it is secured by the stock in FJK IV Properties.

WMK Properties

WMK also filed for chapter 11 bankruptcy.  The case was converted to Chapter 7 on October 29, 2015.  The Debtor no longer has any interest in WMK.  To the detriment of the Debtor's creditors, the profit that could have been obtained from the WMK property were squandered by the appointed trustee, the lawyers, and the real estate brokers.

## III.   FINANCIAL INFORMATION

The Debtor has filed schedules of assets, liabilities, income and expenses, a Statement of Financial Affairs, and Monthly Operating Reports which contain the most accurate and current information available to the Debtor.

A. Real Property.  The Debtor does not presently own any real property in his name.

B. Personal Property.  The Debtor holds stock in various companies that own valuable pieces of property.  The remaining assets are:

| Company | % ownership | Assets owned | Value of assets |
|---|---|---|---|
| FJK IV Properties | 100% | 50 % interest in FJK-Tee Jay 241 Royal Palm Way | $ 6,750,000.00 |
| KMS Restaurant Corp | 100% | malpractice claim | $ 4,000,000.00 |

9

|  | (claim against Cohen, Norris et al And Katzman Wasserman et al) |  |
|---|---|---|
| Florida Capital Management 100% | 237 Brazilian Ave. | $ 5,500,000.00 |
| FJK-Tee Jay, Ltd distributions |  | $  750,000.00 |
| Claim relating to overpayment of FCM note |  | $  884,000.00 |

The Debtor has household goods, personal electronics, and clothes that have a combined value of $37,000.00.

The Debtor is owed money by business partners and has claims against those business partners. He also has potential malpractice claims. The value of these asserts are unknown, but are believed to exceed $30,000,000.00.

C.  Post-petition litigation

As mentioned above, at the time of the filing, the Debtor individually owned property located at 412 Brazilian Ave, Palm Beach, FL. The Court approved the sale of the property [ECF #83] on January 13, 2016. The Debtor netted approximately $1,400,000.00, which was placed in the trust account of Furr and Cohen pending further resolution of claims. On September 2, 2016, the Court approved a settlement with PNC allowing PNC to be paid $1,175,000.00. There remains the amount $305,958.81 in the trust account of Furr and Cohen. The Debtor initiated an adversary proceeding to determine the extent, validity and priority of the liens held by PNC (now resolved), Thomas D'Agostino, Sr., and Tasha Enterprises. The Debtor, through the sale of property owned by a related entity, satisfied the judgments held by D'Agostino. The remaining amount is subject to the lien held by Tasha Enterprises. The Debtor is investigating whether there was a possible preferential transfer in granting Tasha Enterprises a lien.

FJK Tee Jay, Ltd. and Tee Jay of Florida, RLLP filed a fraudulent adversary proceeding against the Debtor seeking a determination of a debt and that the debt is non-dischargeable. Through an oversight by the Debtor, he failed to file a timely response to the complaint and a default was entered.

The Debtor has valid defenses to the complaint and has filed an answer, affirmative defenses, and counterclaim, a motion to vacate the default, and Motion to Dismiss based upon fraud (Exhibit " ").

    D.  Ability to Fund and Complete Plan

    The Debtor's financial problems stem mostly around his dispute with his lenders, Thomas D'Agostino, Sr., Thomas D'Agostino, Jr. and the Trust.  Much of the dispute centers on a $1,230,000 wire transfer to the trust account of Robert King, the attorney for the Trust.  Thomas D'Agostino, Sr. refused to recognize this payment as a partial payment on the mortgage, and instead, fraudulently insisted it was a gift to Mr. D'Agostino, despite conclusive evidence that it was a payment of the mortgage.  This testimony was deemed unbelievable by Judge Hyman in a six-hour hearing held on April 15, 2015:

> **COURT:**    **"…I don't believe that a million 230 was a gift.  I don't believe that testimony. Your client testified earlier in the State Court that it was – dealt with a business transaction, other than the one that was involved in the lawsuit."**

> **COURT:**    **"And I'd like for you to explain to me, assuming that I don't believe your client's testimony that it was a gift, because I don't, I don't believe anyone gives a million 230 as a gift when he owes someone, the same person, $2,750,000.  I don't believe it."**

> **COURT:**    **"That's hard – that's what flies in the face of credibility."**

(*See* attached transcript of hearing before Judge Hyman as part of composite Exhibit "D").

    On July 11, 2016, Mr. King changed his testimony and admitted he represented the Trust at the time he received the $1,230,000 from FCM's lawyer.  This testimony contradicted his testimony before Judge Hyman (see deposition of Robert King attached hereto as Exhibit "E", and King's 4-15-15 false testimony before Judge Hyman, attached as Exhibit "F").  The disputed payment led to a default for which the creditors now claim that the Debtor is liable to them in the amount of $4,548,706.09.  However, the Debtor has all of the checks and wire transfer payments to prove that he is actually owed

money.  Debtor believes he will prevail in that lawsuit, which will result in the Debtor being owed $800,000.00.  If the Debtor and FCM are successful, the Debtor will own a $5,500,000.00 asset subject only to the debts owed to and lien of Peter Callahan's company, in addition to $800,000.00 in cash plus awarded legal fees and costs.  However, Judge Hyman has opined on May 6, 2015, that the Debtor is entitled to a credit in Bankruptcy Court for the payment of $1,230,000.00 if he does not receive credit in the State Court.

Aside from the alleged, disputed amount owed to the D'Agostinos and their affiliates, the Debtor has listed on his schedules $205,094.00 owed to undisputed unsecured creditors.  The claim of Wilson Elser  (scheduled for $12,521.35) has been withdrawn and the listed claim of Robin Bresky in the amount of $27,000 was satisfied from a retainer held by her at the time of the filing.  The Debtor will file objections to claims to clarify the remaining claims.  At the time of the filing of this disclosure statement, the remaining outstanding undisputed, unsecured debt is approximately $131,906.54.  The Debtor intends to work out a deal with Tasha Enterprises that will allow the Debtor to use the money being held in Furr and Cohen trust account for the purposes of paying the unsecured creditors in full within 12 months of the effective date.

As mentioned above, the Debtor's wholly owned entity, Florida Capital Management, LLC ("FCM"), owns, 237 Brazilian Ave., which has an approximate worth of $5,500,000.00 (see Appraisal attached as Exhibit "G").  The development of the property will raise the value of the property to over $15,000,000.00.  As part of the investment, 237 Brazilian Enterprises will provide FCM a $15,000.00 per month "development manager fee", as set forth in the commitment letter.  A portion of that monthly fee will be dedicated to creditors.

Another of the Debtor's companies, FJK IV Properties, is the 50% owner of income generating property.  The Debtor, through his company, has a claim for distributions exceeding $750,000.00 and is owed $10,000.00 per month from the excess cash flow generated by the rental income from First

Republic Bank.  The Property had been completely free of a mortgage until D'Agostino, RLLP, and

FJK-Tee Jay illegally placed a mortgage on it on September 16, 2014 (Exhibit "H").

### IV.  EXECUTORY CONTRACTS

The Debtor does not have any pre-petition executory contracts.

### V. LIQUIDATION ANALYSIS

Estimated value of assets:

| Company | % ownership | Assets owned | Value of assets |
|---|---|---|---|
| FJK IV Properties | 100% | 50 % interest in FJK-Tee Jay<br>241 Royal Palm Way | $  6,750,000.00 |
| | | Past due distributions | $     750,000.00 |
| | | Civil claims<br>(claim against Christu, Hart,<br>Shutts & Bowen, et al.) | $20,000,000.00 |
| KMS Restaurant Corp | 100% | malpractice claim<br>(claim against Cohen, Norris et al<br>And Katzman Wasserman et al) | $  4,000,000.00 |
| Frederick J. Keitel, III, P.A. | 100% | none | $           0.00 |
| FJK Management, LLC | 100% | none | $           0.00 |
| Florida Capital Management | 100% | 237 Brazilian Ave. | $  5,500,000.00 |
| | | Overpayment on note | $     884,000.00 |
| Palm Beach Executive Suites | 100% | none | $           0.00 |
| 812 Investors | 100% | none | $           0.00 |
| Personal property | | | $       37,000.00 |
| Potential claims/lawsuits | | | $30,000,000.00 |
| | Amount available for unsecured creditors | | $67,921,000.00 |

Administrative Claims       $     200,000.00
(*$150,000 of admin claims are disputed)
Priority Claims                 $      20,008.67

13

|  | _____ |
|---|---|
| Amount available for general unsecured creditors | $67,700,991.33 |

Although the Debtor has substantial assets that exceed the amount of the debts, these debts are all unliquidated claims.  If converted or a trustee appointed to liquidate the claims, the creditors will receive nothing.  Rather, the creditors with whom the Debtor has claims against will take the assets of the Debtor, leaving no money for distribution to the creditors.

The Debtor believes that U.S. Trustee Rodriguez will give away the money to friendly lawyers, accountants, brokers, and others, as retaliation for Debtor's whistleblower allegations against Feinman and others.  The U.S. Trustee will squander $500,000.00 to $1,000,000.00 in fees alone, and the U.S. Trustee will dissolve the FCM lawsuit, sell the property, and pay the broker a $300,000.00 commission, to the detriment of the creditors.

But for conflicts of interest and prejudice, the U.S. Trustee should be backing the Debtor's plan; especially in light of Judge Hyman's opinions regarding the lack of credibility of D'Agostino's testimony.  Instead, he appears intent on retaliation and punishment towards the Debtor for his whistleblowing against his colleague and office mate, U.S. Trustee Heidi Feinman, even to the detriment of the creditors.

## VI. SPECIAL RISK FACTORS

Certain substantial risk factors are inherent in most plans of reorganization in Chapter 11 cases. If such plans are accepted, it is usually because they represent a far greater return in dividends than in a liquidating Chapter 7 case.  There is no risk in this plan to undisputed unsecured creditors.  They will be paid in full on the effective date.  The Debtor expects to pre-sell one of the townhomes within 4-6 months of the start of construction.  The Debtor's success is also predicated on his success with litigation with his business partners.  These business partners are fully protected by the value of the property ($5,500,000.00) owned by the Debtor.   The risk to all creditors is mitigated by the value of

14

the various properties.  The creditors would all be paid in full if the Debtor is not able to make the proposed payments and the property is liquidated.  However, the Debtor would needlessly be denied the ability to realize profits of $5,000,000.00 to $6,000,000.00 after all creditors are paid 100% on the dollar.  The only risk is the U.S. Trustee and the D'Agostinos working together to deprive the Debtor and creditors of their rights. The greatest risk is that of the Trustee converting this case, being allowed to pay off friends instead of the creditors, and dropping Debtor's valid claims and lawsuits.

ALL THE RISK FACTORS INHERENT IN A PLAN OF REORGANIZATION UNDER CHAPTER 11 ARE PRESENT IN THIS CASE.  CREDITORS ARE URGED TO CAREFULLY READ THIS DISLOSURE STATEMENT AND THE ACCOMPANYING PLAN OF REORGANIZATION SO THAT AN INFORMED JUDGMENT CAN BE MADE WITH RESPECT TO VOTING ON THE PLAN.

## VII. SUMMARY OF NON-BANKRUPTCY LITIGATION

At the time of the filing of the case, the Debtor had the following pending cases in state court:

FJK-Tee Jay, LTD, et al. vs. Thomas D'Agostino, et al. 2012CA023240:  Debtor's action for partition, fraud, tortious interference against the D'Agostinos.  No action has been taken on this case since February, 2016.

Thomas D'Agostino vs. Frederick Keitel, III, et al, 2013CA004692:  Foreclosure of property. Judgment entered, plaintiff satisfied from sale of property.  Dispute exists as to amount of attorneys' fees.   See Motion to Vacate for Fraud attached as Exhibit "I".

Thomas B. D'Agostino, Sr., et al. vs. Florida Capital Management, et al. 2013CA004699: Action against FCM to foreclose on property.  A Motion to Vacate the foreclosure due to fraud is pending.

Thomas B. D'Agostino vs. Frederick Keitell, III, 2015A000166:  Final Judgment entered, satisfied by sale of property.

PNC Bank, N.A. vs. Frederick Keitel, III, et al. 2015CA010746:  Final judgment entered.  PNC

has been fully satisfied with approval by this Court.

FJK IV Properties, Inc., et al. vs. Thomas B. D'Agostino, Jr. et al. 2015CA011522:  Complaint for damages and injunctive relief.  Amended complaint is pending.  There has been no activity since February, 2016.

Tee Jay of Florida, RLLP v. FJK IV Properties, Inc., 2016CA010381:  Initial Complaint filed. Case is based upon fraudulent claims by Jonathan D'Agostino meant to interfere with Debtor's Plan and is without merit.  Jonathan D'Agostino signed the Proof of Claim under penalty of perjury, knowing that said claims were false.  An Answer, Affirmative Defenses, and counterclaims for fraud, conspiracy, and other causes of action has been filed.  A motion to remove the case to the U.S. District Court may be sought as well.

Debtor is preparing a lawsuit against Robert Furr and Furr & Cohen, P.A., for fraud, negligence, malpractice, and extortion, based upon the aforementioned threats by Furr, who is also currently under investigation.

## VIII. CLAIMS

The deadline to file a proof of claim was April 7, 2016.

The secured claim of PNC has been satisfied

The Internal Revenue Service has filed a claim for estimated taxes in the amount of $39,815.37. The amount of $20,008.67 is claimed as a priority claim.  The claim is based on unfiled returns for 2011 and 2014.  The Debtor has been unable to file a return for other tax years because his business partners have failed to provide necessary documents to complete a return, in an attempt to tortuously interfere with this reorganization plan.

The secured claim filed by Thomas D'Agostino, Sr. in the amount of $337,659.41, was satisfied on February 5, 2016 when he received a payment of $4,431,815.55.  To the extent the claim is valid, it is secured by the Debtor's stock in FJK IV Properties.

Claim number 4 filed by FJK-Tee Jay of Florida and Thomas D'Agostino, Jr. is disputed and is

16

being liquidated in state court proceedings.  The Debtor initially filed an original lawsuit against the claimant and the D'Agostinos for damages in excess of $20,000,000.00.  The claim filed against the Debtor in this case is retaliatory, unsubstantiated, and based on fraud.  It is clearly without merit and an attempt to interfere with the Debtor's Plan and reorganization efforts.

FJK-Tee Jay has filed two unsecured claims, one in the amount of $5,923,551.31 and the other in the amount of $504,948.49.[4]  The Debtor has filed a Motion to Dismiss (Exhibit J-1).  The Debtor has a lawsuit against the claimant for $20,000,000.00.  Both claims are unsubstantiated and are being litigated in the 15th Judicial Circuit in and for Palm Beach County, FL.[5]  Both claims are based upon fraud and perjury by Jonathan D'Agostino, who committed perjury and fraud when he signed a fraudulent proof of claim form 410.

The accounting firm of Schain Leifer Guralnick ("SLG"), and accountant, Karen Stein, who have represented and filed taxes for the D'Agostino family (including Jonathan) for over 30 years, filed the 2010 Amended Tax Returns for FJK-Tee Jay, Ltd. changing the $500,000.00 distributions to income, under the specific instructions of Thomas D'Agostino, Sr., Jonathan D'Agostino, and Thomas D'Agostino, Jr. (see email dated 7/16/12 from Thomas D'Agostino, Sr. to Debtor: "I'll talk with Karen [Stein] this week and see what the impact is on me", attached as Exhibit "K").  The Motion to Dismiss for Fraud and Perjury by Jonathan D'Agostino is attached with a copy of Karen Stein's deposition (Exhibit "L").

The Debtor has also filed a Motion to Dismiss a fraudulent claim filed by Jonathan D'Agostino, Thomas D'Agostino, Jr., Tee Jay of Florida, RLLP, and FJK-Tee Jay of Florida, Ltd. for $5,923,551.36

---

[4] FJK-Tee Jay of Florida and FJK Tee Jay, Ltd. filed an adversary proceeding against the Debtor seeking a determination that debts in excess of $5,000,000 were non-dischargeable.  The Debtor mistakenly failed to file a timely response.  The Debtor has defenses to this action and will be seeking to have the discharge vacated.   The Debtor has filed counterclaims against the parties, and attached a Motion to Dismiss for Fraud in a supplemental filing to this Disclosure Statement.

[5] Thomas D'Agostino, Jr. has already admitted under oath that part of the allegations have no merit or basis in fact regarding the loss of income on Citicorp's lease.  Further there is a valid defense as to whether a valid mortgage exists on the property at 241 Royal Palm Way, Palm Beach, FL.  There was no mortgage on the Property from January 20, 2013 until September, 2014, when the D'Agostinos placed a mortgage without the Debtor's knowledge or consent.

(Note: there is no such company named FJK-Tee Jay of Florida, Ltd.).  While the Debtor has attached a copy of Debtor's Motion to Dismiss the claim due to fraud (Exhibit "L"), it is important Debtor with ____ critical issues of the fraud on the Bankruptcy Court by the D'Agostinos and their entities by addressing their meritless claims:

1)    <u>Misrepresenting the property's actual square footage re: the Citigroup lease, causing FJK-Tee Jay, Ltd. to lose $1,785,000.00</u>:  The Citigroup lease never had a lease document that included square footage within it, and was not leased based on square footage.  The D'Agostinos knew this when Jonathan D'Agostino signed the Proof of Claim under penalty of perjury.  Thomas D'Agostino, Jr. and Jonathan D'Agostino have filed a fraudulent proof of claim in an attempt to sabotage the Debtor's Plan (see copy of the Citigroup Lease attached as Exhibit "M").

Jonathan D'Agostino willfully signed a fraudulent proof of claim to cover up the fraud committed by Thomas D'Agostino, Sr. and Jr., who were both terminated by Workflow Management, Inc. for misappropriation of funds and lying to the Board of Directors, Audit Committee, and outside auditing firm, Price Waterhouse (see the July 31, 2003 10Q filed by Workflow Management).

The Debtor, as General Partner of FJK-Tee Jay, Ltd., was forced to bail out Thomas D'Agostino, Sr. and Jr. based upon fraudulent claims by the D'Agostinos.  Thomas D'Agostino, Sr.. was Chairman and CEO of Workflow.  Thomas D'Agostino, Jr. was President of a large division and on the Board of Directors of Workflow before both were terminated and Thomas D'Agostino, Sr. was forced to pay back and forfeit over $3,000,000.00 in compensation and benefits, for misappropriation of funds and lying to cover it up (see attached SEC 10Q exhibit in Answer).  Thomas D'Agostino, Jr. was also the Secretary and Treasurer of FJK-Tee jay, Ltd., and was fully involved with and had knowledge of the leasing to Workflow Management.

18

The false and fraudulent allegation that the Debtor would cheat himself and his company, FJK IV, as well as the D'Agostinos and Tee Jay, for the benefit of Workflow, which the D'Agostinos controlled, is not believable and, in the words of Judge Hyman, "flies in the face of credibility".

2)      <u>Illegally negotiating and accepting an offer to sell the Property</u>:  There was nothing illegal about the contact to sell the Property for $10,200,000.00, after the D'Agostinos and Tee Jay signed an agreement to hire a mortgage broker (Exhibit "N") and then gave false and fraudulent information to the prospective lender.  There were no damages to FJK-Tee Jay.  FJK-Tee Jay, Ltd. received multiple offers to purchase the First Republic Bank Building at 241 Royal Palm Way, Palm Beach, Florida, for $12,200,000.00, which the D'Agostinos, Tee Jay of Florida, RLLP, and their lawyers rejected.  The offer is still available and open.  It was an insurance policy to avoid foreclosure, there was a $7,500,000.00 profit to FJK-Tee Jay, and the cancelation penalty to FJK Tee Jay (insurance policy) was only $19,000.00.

The Debtor was the General Partner of FJK-Tee Jay, with full powers as per the Bylaws. Even if the Court were to find that the Debtor did not have the authority to sell the Property, the D'Agostinos had seven months to secure a mortgage and failed to do so (see broker's email attached as Exhibit "O").  Had the D'Agostinos and Tee Jay not interfered in an attempt to defraud the Debtor and FJK IV, there would have been a realized profit of $7,500,000.00, and no litigation between the parties.

3)      The D'Agostinos and FJK Tee Jay of Florida, RLLP, along with their various attorneys, Robert King, Andrew Rose, and Eric Christu, illegally and fraudulently redeemed the Final Judgment of Foreclosure, in violation of the prior court orders of Judges Brunson and McSorely (attached) that held that they had no standing to enter or interfere with that case (see Brunson order attached as Exhibit "P"; McSorely Order attached  as Exhibit "P"; and Motion to Set

Aside Illegal Redemption (Exhibit "Q") and Opposition to Motion to Intervene, attached as Exhibit "U").

If FJK-Tee Jay is successful, it will be able to execute on ownership interest of the Debtor in FJK IV Properties. FJK-Tee Jay, Ltd. has received numerous offers to purchase 241 Royal Palm Way for $12,200,000.00 (Exhibit "B"). Based on offers sent to FJK-Tee Jay, Ltd to purchase the property and rejected by Jonathan D'Agostino, the Debtor estimates the value of his ownership interest in FJK IV Properties is approximately $6,750,000.00. Tee Jay of Florida would be fully satisfied from the shares in FJK IV Properties. To the extent that the claim is valid, it is unsecured. The Debtor will be seeking to estimate the claim pursuant to 11 U.S.C. § 502(c)(1).

Claim number 10 filed by Thomas D'Agostino, Sr. and Thomas D'Agostino, Jr as Trustees arises from a guarantee of a debt alleged owed by Florida Capital Management. That claim is disputed and being litigated in state court. The claim is a contingent claim for $4,548,706.09. The property that secures the debt is valued at $5,500,000.00. Consequently, it is unlikely that the Debtor will have any liability for this claim. Further, neither the Debtor nor Florida Capital Management is liable to the claimant. Rather the claimants owe Florida Capital Management $884,803.00 as a result of overpayments. The Trust's claim has already been discounted by this Court when Chief Judge Paul Hyman, Jr. described Mr. D'Agostino, Sr.'s testimony as not believable or credible after a six hour evidentiary hearing on April 15, 2015 (see Exhibits "D"). To the extent that the claim is valid, it is unsecured. The Debtor will be seeking to estimate the claim pursuant to 11 U.S.C. § 502(c)(1).

The claim of Tasha Enterprises is partially secured by funds held in trust by Furr and Cohen. A portion of Tasha Enterprises claim will be paid from the remainder of the amount being held in Trust. The unsecured portion owed to Tasha Enterprises will be paid as an unsecured claim.

Other unsecured, undisputed claims, filed and unfiled, amount to $131,906.54.

## IX. SUMMARY OF PLAN OF REORGANIZATION

A.  Purpose of the Plan of Reorganization

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive.  The Plan also states whether each class of claims or equity interests is impaired or unimpaired.  If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

B.  Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code.  They are not considered impaired, and holders of such claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  As such, the Plan Proponent has not placed the following claims in any class:

1.  Administrative Claims

Administrative expenses are costs or expenses or administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition.  The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

Administrative claims:

| | | |
|---|---|---|
| Professional fees: | estimated $160,000.00 (*most of this amount is disputed) | Subject to Court authorization, to be paid in full on effective date or as agreed to by attorney and Debtor. |
| Office of the US Trustee | current | Paid in full on effective date |

2.  Priority Claims

The Internal Revenue Service has filed a priority claim for estimated taxes in the amount of

$20,008.67.  The debtor will pay this amount in full by paying $833.70 per month for 24 months.


C.  Classes of Claims and Equity Interests

2.1    Class 1.    The secured claim Thomas D'Agostino, Sr. to the extent allowed as a secured claim under § 506 of the Code.

2.2    Class 2.    The secured claim of Tasha Enterprises to the extent allowed as a secured claim under § 506 of the Code.

2.3    Class 3.    The unsecured claims.

2.4    Class 4.    A convenience class.

2.5    Class 5.    The interests of the individual Debtors in the property of the estate.

The Plan shall provide for the payment of all expenses of this proceeding, including fees due the Office of the U.S. Trustee.  The accompanying Plan of Reorganization divides creditors into the following classes:

Class 1 – The disputed secured claim filed by Thomas D'Agostino, Sr. in the amount of $337,659.41, was satisfied on February 5, 2016 when he received a payment of $4,431,815.55 (see Larry Glick's attached emails).  To the extent the claim is valid, it is secured by the Debtor's stock in FJK IV Properties.  If it is a valid claim, it will be amortized at 4% and the Debtor will pay $6,218.51 per month for a period of 60 months.

Class 2 – Tasha Enterprises, Inc.  Tasha Enterprises has filed a secured claim in the amount of $403,543.29.  The claim is secured by proceeds from the sale of the property located at 412 Brazilian Court.  It is estimated that Tasha has a valid secured claim in the approximate amount of $125,000.00 which will be satisfied from the funds held by Furr and Cohen.  The remaining amount owed will be paid in accordance with Class 3.

Class 3 – The estimated, undisputed, unsecured claims total approximately $131,000.00.  If it is determined that is the extent of the claims, the creditors will be receive a monthly payment of

22

$2,183.33 and be paid over 24 months.  If the D'Agostinos or their entities have valid claims against the Debtor, the Debtor will need to liquidate his shares in FJK IV Properties.  Creditors will be paid in full within 24 months of the effective date.

Class 4 – Convenience class.  All claims in the amount of $5,000 or less will be paid in full in monthly installments over a period of 12 months.

Class 5 – The Debtor shall retain all property of the estate.

The Debtor shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. Section 1930(a)(6) within ten (10) days of the entry of this order for pre-confirmation periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the cash disbursements for the relevant period. The reorganized Debtor shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) based upon all disbursements of the reorganized debtor for post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), until the earlier of the closing of this case by the issuance of a Final Decree by the Court, or upon the entry of an Order by this Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code, and the party responsible for paying the post-confirmation United States Trustee fees shall provide to the United States Trustee upon the payment of each post-confirmation payment an appropriate affidavit indicating all the cash disbursements for the relevant period.

The plan proposes to pay all costs and expenses of administration within thirty days of the date of confirmation of the Plan, or within such additional time as the administrative claimants may allow. The total amount of administrative expenses has not yet been determined, but will be set by the Court at the hearing on the confirmation of the Plan.

The plan will be funded by the income to be received by the Debtor as the developer of the Florida Capital Management project and money in escrow.  The Plan of Reorganization is deemed by

the Debtor to be feasible and secured.

## X.  CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requires that:  the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor at least as much as the creditor would receive in a chapter 7 liquidation case, unless the creditor votes to accept the Plan; and the Plan must be feasible.  These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A.  Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to accept or reject the Plan.  A creditor has a right to vote for or against the Plan only if that creditor has a claim that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.  The Plan Proponent believes that classes are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

### 1.  What is an Allowed Claim?

Only a creditor with an allowed claim has the right to vote on the Plan.  Generally, a claim is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim, unless an objection has been filed to such proof of claim.  When a claim is not allowed, the creditor holding the claim cannot vote unless the Court, after notice and hearing, either overrules the objection

24

or allows the claim for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

**The deadline for filing a proof of claim in this case was April 7, 2016**

### 2.  What is an Impaired Claim?

As noted above, the holder of an allowed claim has the right to vote only if it is in a class that is impaired under the Plan.  As provided in § 1124 of the Code, a class in considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3.  Who is Not Entitled to Vote?

The holders of the following types of claims and equity interests are not entitled to vote:

–      holders of claims and equity interests that have been disallowed by an order of the Court;

–      holders of claims and equity interests that are not "allowed claims" or "allowed equity interests", unless they have been "allowed" for voting purposes.

–      holders of claims or equity interests in unimpaired classes;

–      holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3) and (a)(8) of the Code;

–      holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and

–      administrative expenses

**Even if you are not entitled to Vote on the Plan, you have a right to object to Confirmation of the Plan.**

### 4.  Who Can Vote in More than One Class?

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise holds claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

### B.  Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class of creditors, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes as discussed below in Section B.2.

1.  Votes Necessary for a Class to Accept the Plan

A class of claims accepts the Plan if both of the following occur:  (1) the holders of more than one-half (½) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

2.  Treatment of Nonaccepting Classes

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manned prescribed by § 1129(b) of the Code.  A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan.  The Code allows the Plan to bind nonaccepting classes or of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a "cram down" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

## XI.  EFFECT OF CONFIRMATION

In accordance with 11 U.S.C. § 1141(d)(5), the Debtor will not, without court order, be entitled to a discharge until all payments are made pursuant to the terms of the Plan.

The Debtor will seek to have the case administratively closed until all payments are made and the Debtor is entitled to a discharge.

The Plan offers to pay all undisputed creditors in full.

By:_____

Frederick Keitel, III*

*Prepared with assistance of counsel.